IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>WARREN R. STACK,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:07-CR-899-TC |

In 2007, Dr. Warren R. Stack was indicted on multiple counts of distributing a controlled substance (primarily Oxycodone) without a legitimate medical purpose and outside the bounds of medical practice; illegal distribution of a controlled substance that resulted in the death of a person; health care fraud; and conspiracy to distribute a controlled substance, commit health care fraud, and engage in money laundering. The government obtained the indictment after gathering evidence from, among other things, searches of Dr. Stack's office, his office computers, and his bank account records.

This matter comes before the court on Dr. Stack's motion to suppress all evidence seized during the three searches, in which he contends that the government violated his Fourth Amendment right to be free of unreasonable searches. Specifically, he argues that the warrant authorizing the search of his office was not valid on its face and so the office search was essentially warrantless and *per se* unreasonable, and, relatedly, the warrant was overbroad. He challenges the second and third searches on the grounds that evidence seized was fruit of the

poisonous tree and that the warrants lacked probable cause, were overbroad and lacked a nexus between the areas to be searched and evidence of the alleged crimes. Finally, he contends that the good faith exception to the warrant requirement, set forth in United States v. Leon, 468 U.S. 897 (1984), does not salvage the searches.

For the reasons set forth below, the court finds that the three warrants were valid, but even if they lacked probable cause, the Leon good faith exception applies. Accordingly, Dr. Stack's Motion to Suppress is DENIED.

## I. FINDINGS OF FACT[1]

Most of Dr. Stack's claims can be resolved based on review of the warrants and accompanying affidavits. But the court did hold an evidentiary hearing to obtain the testimony of the government agent who directed the search of Dr. Stack's office. Also, Dr. Stack has submitted the affidavit of Jeff Wright, a private investigator, who discusses the nature of materials seized from Dr. Stack's office.[2]

---

[1]Unless otherwise noted, the facts are taken from the search warrant affidavits, the warrants, and evidence admitted during the court's December 5, 2008 evidentiary hearing concerning the search of Dr. Stack's office.

[2]In his affidavit, Mr. Wright also opines that the first search was not properly conducted, but the court does not find his opinion helpful. See, e.g., United States v. Riccardi, 405 F.3d 852, 863 (10th Cir. 2005) ("Whether the good faith exception should be applied is a question of law" for the court to decide); United States v. Sugar, 606 F. Supp. 1134, 1150 (S.D.N.Y. 1985) (in opinion on probable cause challenge to warrant authorizing search of doctor's office, court rejected defense affidavit of Assistant Director of New York Bureau of Narcotics Enforcement, which assailed case agent's handling of investigation. In opinion, the court stated, "While the practice espoused by [the Assistant Director] may be preferable, I do not find that [the agent's] tactics, or his affidavit relating his experiences to [the signing magistrate], are so inherently suspect that his information should be disregarded. [The magistrate] could, and presumably did, properly rely on [the agent's] investigation and the information it uncovered.").

A.      **The Initial Investigation and Application for Warrant to Search Dr. Stack's Medical Office**

In June 2005, state and federal agents began investigating complaints about the prescribing practices of Dr. Stack.  The investigation culminated in the December 12, 2007 Indictment against Dr. Stack and his co-defendants Phyllis V. Murray and Mindy L. Kramer.

During the investigation, investigators received complaints alleging that some of Dr. Stack's patients overdosed on controlled substances—such as narcotic pain killers Oxycodone and Oxycontin—prescribed by Dr. Stack.  Officials also received complaints from pharmacists who voiced concerns about Dr. Stack's prescribing patterns.  In July 2005, a complainant told the police that Dr. Stack was known on the streets as the "Oxycontin Doctor" because Dr. Stack would "write an Oxycontin prescription for anyone who makes an appointment and asks for the drug."  (May 15, 2007 Aff. for Search & Seizure Warrant [hereinafter "May 2007 Aff."] at 4.)  In March 2006, the DEA's database ranked Dr. Stack, within the State of Utah, as the number one prescriber of Oxycodone, the number two prescriber of Oxycontin, and the number two prescriber of all narcotics combined.

1.      **The Confidential Informants and Undercover Doctor Appointments**

In June 2006, Detective Dan Bartlett of the Salt Lake County Sheriff's Office received information from a reliable confidential informant (CI #1) alleging "that Dr. Warren Stack had been handing out prescriptions [without any valid medical reason] to anyone who went into his office and made an appointment."  (May 2007 Aff. at 5.)  Detective Bartlett contacted the Utah Division of Professional Licensing (DOPL) and was referred to Drug Enforcement Agency

(DEA) Diversion Investigator[3] Thomas Irvin.  Detective Bartlett and Agent Irvin met with CI #1

and set up an undercover operation by scheduling an appointment for CI #1 to meet with Dr.

Stack on August 8, 2006, in an attempt to get a prescription for a controlled substance.  On that

day, Detective Bartlett, working undercover, went with CI #1 to Dr. Stack's office.  The agents

attached an electronic monitoring device to CI #1, through which agents off-site could hear

CI #1's conversations with Dr. Stack.  During the appointment, Dr. Stack performed "a cursory

examination" of CI #1 and prescribed Oxycontin, Oxycodone, Soma,[4] and Ibuprofen 800

milligram tablets.  (May 2007 Aff. at 6-7.)

On September 5, 2006, CI #1 went to a second appointment with Dr. Stack.  Based on

what agents heard through the electronic monitoring device and based on CI #1's description of

Dr. Stack's actions, Detective Bartlett and Agent Irvin explained in their affidavit that:

> Stack attempted to take the blood pressure of [CI #1] but did not complete the
> action.  According to [CI #1], Stack placed the blood pressure cuff around [CI
> #1's] arm and pumped it up a few times and sat down to write out his
> prescriptions.  Stack did not question [CI #1] concerning any pain, x-rays, or any
> pertinent information expected from a prescribing physician.  Stack informed
> [CI #1] prior to exiting the examination room that this is where you can get your

---

[3]As a diversion investigator, Agent Irvin "investigates persons and businesses that are registered under the Controlled Substance Act, who administer, dispense, prescribe, distribute, manufacture, and conduct various other activities with controlled substances which pass through the distribution system in the United States."  (May 2007 Aff. at 3.)  As part of his duties, he investigates reports that legal prescription drugs are being diverted illegally through distribution or possession (for example, a medical doctor prescribing controlled substances for something other than a legitimate medical purpose in the usual course of professional practice).  (Id. at 4; Indictment at ¶ 11 (citing Controlled Substances Act).)

[4]"Soma and Xanex are sometimes prescribed along with narcotic pain medications, [but] only after thorough medical tests and examinations are conducted.  According to the National Drug Intelligence Center, a component of the U.S. Department of Justice, abusers typically ingest Soma orally and in combination with other drugs to enhance the affects of those drugs [including Oxycontin, Oxycodone, and Hydrocodone]."  (May 2007 Aff. at 13.)

prescriptions re-issued on a monthly basis.  Stack issued [prescriptions for Oxycontin, Oxycodone, and Soma to CI #1].

(Id. at 6.)

On October 4, 2006, CI #1 attended a third appointment with Dr. Stack.  This time, after CI #1 told Dr. Stack he was there to get medications and that he needed something to help him sleep, Dr. Stack prescribed Oxycontin, Oxycodone, Soma, and Restoril (a sleep aid).

In March 2007, Detective Bartlett, using an undercover name, acted as a patient and went to two appointments with Dr. Stack.  He complained of a wrist injury.  During the first visit, he received prescriptions for two medications (ibuprofen 800 milligram tablets and Ultram[5]) and wrist braces to treat carpal tunnel syndrome.  During the second visit, Detective Bartlett asked for something much stronger to relieve the pain, so Dr. Stack prescribed Oxycodone.

Also in March 2007, a second confidential informant (CI #2) came forward with information about Dr. Stack.  CI #2 said that in 2003, Dr. Stack arranged to pay CI #2 for referring dealers to his office to obtain prescriptions for Oxycontin, Percocet, Lortab, Xanax, and other prescription drugs.  CI #2 also received some of the proceeds made by the individual who filled the prescription and sold the drugs on the street.

The investigators arranged for CI #2 to attend an April 4, 2007 appointment with Dr. Stack (during which CI #2 was wearing a recording and monitoring device).  During the appointment, Dr. Stack recognized CI #2, acknowledged CI #2's past practice of referring patients to Dr. Stack, talked as if he were examining CI #2 even though he did not touch CI #2,

---

[5]According to the official website of the DEA Office of Diversion Control, Ultram is a semi-narcotic pain reliever that is not currently regulated as a controlled substance.  See http://www.deadiversion.usdoj.gov/drugs_concern/tramadol.htm.

asked about CI #2's back injury (the CI never mentioned a back injury during the appointment),

and prescribed Oxycontin, Soma, and Ibuprofen 800 milligram tablets.

     **2.**     **Street Dealers Selling Drugs Reportedly Prescribed By Dr. Stack**

In December 2006, in a separate investigation, police officers searched the home of Nick

and Cheri Young after completing two controlled purchases of Oxycontin from the Youngs.  Mr.

Young apparently confessed that he obtained Oxycontin from Dr. Stack (through meetings with

Dr. Stack in the lobby of Dr. Stack's office) to sell on the street and that he referred patients to

Dr. Stack to get prescriptions for controlled substances.

     **3.**     **DEA Consultation With Expert Witness and Allegation that Medical Practice was "Permeated With Fraud"**

In May 2007, investigators met with a medical doctor who had been an expert witness for

the DEA concerning appropriate patient care.  The doctor indicated that, "based on the

Investigators' synopsis concerning the prescribing and patient care practices by Dr. Stack, there is

good reason to suspect the legitimacy of the doctor's practice."  (May 2007 Aff. at 13.)  He also

opined that Dr. Stack's "practice [was] an excuse to write prescriptions."  (<u>Id.</u>)  According to the

DEA expert,

> If a legitimate physician sees a patient who has a documented drug history or the
> physician suspects drug use or addiction, the physician should take added care
> relative to treatment due to the patient's past drug history. [The doctor] further
> stated that the medical records should reveal the difference between legitimate
> practice and a prescription mill.

(<u>Id.</u>)

The affidavit and application for a warrant to search Dr. Stack's office contained all of

the information set forth above.  The agents noted that they believed the search would reveal

6

evidence of a crime in violation of the Utah Controlled Substances Act, Utah Code section § 58-37-8 ("Prohibited Acts — Penalties").  In the affidavit's last paragraph, they stated under oath that, based on their training, experience, and information presented in the affidavit, they believed Dr. Stack's office was "permeated with fraud."  (May 2007 Aff. at 14.)

**B.**     **Search of Dr. Stack's Medical Office**

   **1.**     **Contents of May 15, 2007 Search Warrant (the "First Warrant")**

   A State of Utah judge issued the search warrant, finding there was probable cause to believe that evidence of a violation of the Utah Controlled Substances Act would be found at Dr. Stack's office.  (See First Warrant at 1 (attached as Ex. 1 to Def.'s Mem. Supp. Mot. Suppress).)  The First Warrant described the person and place to be searched:

> [T]he person of **Warren R. Stack, M.D.** [birth date redacted], Described as a Caucasian male, 60 years of age, 6'00", 200 pounds, brown hair, and brown eyes. SSN [redacted].

> [T]he business known as **Warren Stack M.D. at 5005 S. 900 E Suite 120 Murray Utah 84117**.  Described as a professional office building constructed of tan stucco, red brick, white trim, and a grey colored composition shingle roof. The numbers **"5005"** are attached to a sign in the front portion of the building on the west side of the property.  The front double doors are glass with large windows and faces west, hinged on both sides and opens out.  Suite 120 is on the main level of the building on the west side.  Suite 120 has a glass and wood door that is labeled suite 120 Warren R. Stack M.D. Internal Medicine.  To include all rooms, attics, closets, and other parts therein.

(Id. at 1 (emphasis in original).)  It also described the "property or evidence" to be seized:

   1.     Business documents; to include but not limited to accounting books and records, receipts, phone records, hand written notations, billing documents, financial receipts, employee rosters, employee work schedules, employment applications and/or bank statements records or contracts, payroll information, tax records, call logs, and employee photographs.

   2.     Patient records; to include but not limited to patient names, phone

numbers, appointment schedules, address, pager numbers, and email
addresses, either written or electronically stored on, Computers and media
storage devices, or audio/video recording devices; to include but not
limited to desktop computers, lap top computers, communication
devices[,] personal data assistants, and all applicable data storage devices,
both internal and external.

3.      Patient records; Patient charts; to include the following medications that
have been prescribed to the U/C, C/S or patients that have overdosed
and/or died.  And any patient that has been prescribed the following
medication: Oxycontin, Oxycodone, Hydrocodone, Alprazolam-Xanex,
Methadone-Methadose, Soma-Carispradol, and Fentnyl.

4.      Phone records; bills, phone numbers, cell phone call lists, and caller id
lists.  And authorization to intercept incoming telephone calls during
execution of said warrant.

5.      And all other items determined to be instrumentalities of the crime of
distribution of controlled substance[.]

(Id. at 1-2.)

The First Warrant has notable gaps.  Although the document is titled "Search Warrant," it

does not contain actual language authorizing a search or seizure, any language limiting how,

when or within what period of time the agents were allowed to conduct any search or seizure, or

any language requiring the agents to return the warrant to the magistrate.  (See id.)

**2.      Execution of First Warrant**

The First Warrant was executed on May 16, 2007.  (Tr. of Dec. 5, 2008 Evid. Hr'g

[hereinafter "Tr."] at 9.)  A few hours before the search team went into Dr. Stack's office, they

met for a briefing on the nature of the warrant and how the search was to be conducted.  Robert

Johnson, a Diversion Investigator for the DEA who was part of the search team, attended the

briefing.  During the briefing, members of the search team were given a copy of the First Warrant

as well as a list of patient names and prescription drugs (essentially the same drugs listed in the

First Warrant's paragraph three).  According to Agent Johnson:

> We were told that the – the list of patient names were specific patients['] [files] that we wanted to take, but the [drug list was] given to us so that if we happened to run through any other patient files in which those particular drugs were being prescribed, that we wanted to take those also.

(Tr. at 10.)

Agent Johnson was assigned the job of "finder."  (Tr. at 12.)  As the finder, Agent Johnson had final say whether to seize a particular item.  He was the "gatekeeper."  (Id.)  The factors he considered when deciding whether to seize an item were "whether [the items] were on the list in the search warrant, whether they were listed on [the drug list and patient list distributed during the briefing.]"  (Id. at 18.)

Finding records for patients on the list was relatively straightforward.  But in order to determine whether a drug had been prescribed to a patient whose name was not on the list, the agents had to look through many patient files to determine whether any of the listed drugs had been prescribed to that patient.  Given the volume of patient files in the office, the agents reviewed approximately "every fourth file or every fifth file . . . . [They] would have been there forever if [they] looked through every file."  (Id.)  Agent Johnson explained that "when we take [seized items] back to the office, then we look through them and make sure they are relevant to what we wanted.  And if we happen to find things that . . . we feel . . . may have not been relevant or that we don't need, then we will list those and given them back to the defendant." (Id. at 19-20.)

Indeed, after the search, the agents returned a number of items to Dr. Stack.  (See Pl.'s Ex. 3.)  When asked why they seized items that were not relevant, Agent Johnson responded,

As we go through these items, a lot of times there are like loose papers in the office or things laying around the office that maybe were not filed or we feel like might have been relevant to a specific patient or other things that we were concerned with searching for, and oftentimes we don't – you know, if there's a big stack there, we'll kind of thumb through there and randomly see certain things, but it's – in the interest of time . . . .  we don't have time to search through every paper, so if there appears to be some in there that are relevant, we may take that stack of papers with us and then come back and go through it and find that, hey, we didn't need this or that, and so those items should be returned.

(Tr. at 21.)   He noted that they took "relatively few" records in comparison to the large number of files that were in the office.[6]  (Id. at 19.)

In addition to taking paper files, the agents seized three computers.  (See Inventory attached to Return to First Warrant (Pl.'s Sealed Ex. 5).)  The content of the computers was not revealed during the search of the office.  Rather, the agents turned the computers over to the government's computer search technicians, who made a mirror image of the three computers before returning the computers to Dr. Stack's office.  Agents obtained a separate warrant to electronically search the computers.  That warrant, which Dr. Stack also challenges, is discussed below.

_____

[6]Dr. Stack submitted the affidavit of Jeff Wright to support his motion to suppress.  In the affidavit, Mr. Wright states that he reviewed "discovery and computers that were seized, [and] it appears that the Government officers seized a great deal of information during the course of the search which fell outside the parameters set in Government Exhibits 1 (list of patient records agents were to find) and 2 (list of drugs agents were to locate in records to be seized) and/or 5 (search warrant return to warrant #233)[.]" (Aff. of Jeff Wright ¶ 5 (emphasis added).)  He then describes the nature and amounts of documents that do not fulfill the parameters set forth in the Government Exhibits.  As the United States points out in its supplemental brief, Mr. Wright does not have personal knowledge about the source of the records provided to the defense during discovery.  Accordingly, Mr. Wright's evaluation is not admissible (or helpful to the court).  Moreover, as explained in the court's Conclusions of Law, even if all the documents Mr. Wright describes were seized during the first search, that is not sufficient reason to suppress all evidence seized.

Detective Bartlett returned the inventory of items seized from Dr. Stack's office to the court on February 9, 2008, approximately nine months after the search occurred.[7]

**C.     The Application for Warrant to Seize Dr. Stack's Bank Accounts**

On May 18, 2007, Kevin Wyatt, a Criminal Investigator with the Utah Department of Insurance, Fraud Division (and a Taskforce Agent with the FBI), applied for a warrant to seize Dr. Stack's bank accounts and related documents.  (See May 18, 2007 Aff. for Seizure Warrant (attached as Ex. 4 to Def.'s Mem. Supp. Mot. Suppress).)  Agent Wyatt testified that the bank account information he sought "represents the evidence and/or proceeds of the crime or crimes of Distribution of Controlled Substances and Money Laundering."  (Id. at 1.)  He cites to federal and state statutes prohibiting diversion of the controlled substances and money laundering.

Agent Wyatt's affidavit contained much of the same information provided in the affidavit supporting the First Warrant.  But it also contained six additional paragraphs:

> 44.     During the course of this investigation a mail cover[[8]] was conducted on Dr. Stack by the DEA and the Salt Lake County Sheriff's Office.  The mail cover produced <u>evidence that Dr. Stack received mail items from Washington Mutual Bank regarding personal and/or business accounts</u>.
>
> 45.     On May 16, 2007, a search warrant was executed on the medical office of Warren Stack, MD.  The search produced evidence and testimony from staff members that showed Dr. Stack was seeing between 50-55 patients per day for the purpose of prescribing controlled substance medications with no medical necessity.  Further, evidence showed that Dr. Stack was charging between $70.00 and $200.00 per office visit and the proceeds

---

[7]The "Return to Search Warrant" was, apparently, mistakenly dated February 9, 2006, and the search date erroneously listed as May 16, 2006.  (Compare Pl.'s Sealed Ex. 5 at p. 1 to Inventory dated May 16, 2007, attached to Ex. 5 "Return to Search Warrant.")

[8]A "mail cover" is an investigative tool used by law enforcement to review and record information contained on the outside of an individual's mail without the recipient's knowledge or consent.  (See, e.g., Internal Revenue Manual § 9.9.4.5.2 (Sept. 24, 2007) (defining mail cover).)

11

from these "office visits" were being deposited into [t]he accounts of Dr. Stack.

46.   The search warrant produced evidence in the form of bank statements that Dr. Stack owns personal or business accounts at Chase Bank.  The statements showed deposits in [the] following account numbers [redacted] [in] excess of $800,000.

47.   On May 16, 2007, Mindy Kramer, an employee of Warren Stack was interviewed.  Kramer stated she felt she "was working for a drug dealer." Kramer further stated she was told by Stack on or about January 4, 2007, that he was going to run what he coined as "Express Scripts."  Kramer explained that from on or about January 5, 2007 through March 23, 2007, Stack would sit at the front office desk and when patients came if [sic] for an office visit, Stack would asked [sic] how they were feeling [and] ask if the patient wanted refills.  Stack would then write prescriptions based on no exam, no vitals and no medical testing as long as the patient paid the office visit fee of $66-$70.  Kramer stated Dr. Stack sees approx. 50-55 patients per day for the purposes of writing prescriptions.  Kramer stated she was responsible for collecting the office visit fee.  She was also responsible to [sic] track and deposit the funds in Dr. Stack's account.  She was also responsible to [sic] bill insurance carriers for office visits. Kramer also listed several names for patients that she believed were "recruiters."  The recruiters were paid by other individuals to refer patients to Dr. Stack.

48.   On May 16, 2007, Phyllis V. Murray, an employee of Dr. Stack was interviewed.  Murray is the Medical Assistant to Dr. Stack.  Murray stated she was responsible to take vitals on all patients.  Murray stated she was ordered by Dr. Stack to only take the temperature of patients.  No other vitals were taken by Murray.  Murray stated she noticed the high volume of patients after January 1, 2007, and was present when Dr. Stack began the "Express Scripts" program as Dr. Stack called it.  Murray confirmed the office saw 50-55 patients per day and that Kramer collected office fees and made deposits to Dr. Stack's accounts.  Murray also witnessed patients getting prescriptions from Dr. Stack with no examination or testing.  Murray confirmed that Dr. Stack wrote prescriptions from the front office desk with no patient exams, from on or about January 5, 2007 through March 23, 2007.  Murray stated she had conversations with Kramer about Dr. Stack's practices.  Murray stated she noted about 2-3 weeks prior to this date that she thought Dr. Stack was running a pill mill.

49.   Information obtained in the investigation showed that Dr. Stack was

depositing proceeds from illegal drug transactions into his personal or
business accounts in an effort to hide or fund further illegal business
practices.

(Id. at 21-23 (emphasis added).)

The affidavit described the property to be seized as follows:

1.      Any and all United States Currency, goods, credits, effects, debts due or
owing, or any other personal property of all stocks, or share, or interest in
stocks or shares or negotiable instruments, and any and all records of the
same, currently on deposit in the checking account subscribed to and in the
name of WARREN R. STACK, [date of birth and social security number
redacted], at the CHASE BANK, bearing account numbers [redacted] for
the last 120 days, and

2.      Any and all United States Currency, goods, credits, effects, debts due or
owing, or any other personal property of all stocks, or share, or interest in
stocks or shares or negotiable instruments, and any and all records of the
same, currently on deposit in the checking account subscribed to and in the
name of WARREN R. STACK, [date of birth and social security number
redacted], at the WASHINGTON MUTUAL BANK, for the last 120 days.

(Id. at 1 (emphasis added).)

A state magistrate issued the seizure warrant (Second Warrant) on May 18, 2007.  The

property to be seized was described exactly as was written in the supporting affidavit.  Unlike the

Chase Bank property description, the affidavit did not list any account numbers for the purported

Washington Mutual Bank accounts.  Indeed, the return on the Second Warrant shows that Dr.

Stack did not have any accounts at Washington Mutual, at least during the 120-day period for

which evidence was sought.  (See Pl.'s Sealed Ex. 4.)

**D.      Search of Computers Seized During Search of Dr. Stack's Medical Office**

**1.      Application for Computer Search Warrant**

On July 10, 2007, Detective Bartlett applied to a state magistrate for a warrant to search

13

the mirror image of computers seized from Dr. Stack's office during the May 2007 search.  (See

July 10, 2007 Aff. Supp. Computer Warrant (attached as Ex. 6 to Def.'s Mem. Supp. Mot.

Suppress).)

The affidavit contains two references to the use of computers in Dr. Stack's office.  First,

after the undercover officer finished his March 8, 2007 appointment with Dr. Stack, he "received

a next appointment card [from] the office assistant who pulled the appointment off of the office

computer . . . ."  (Id.)  Similarly, after the undercover officer's March 26, 2007 appointment with

Dr. Stack, the officer "received a 'next appointment' card from the office assistant who pulled

the appointment from the office computer . . . ."  (Id.)

The affidavit also listed a "search strategy":

> The search team will look for evidence shall be [sic] related to the criminal
> activities of illegal distribution of controlled substances during a period beginning
> at an unknown time but at least by January 1, 2005, through and including May of
> 2007;
>
> And that such evidence shall relate only to the activities of Warren Stack
> M.D. and shall not include the activities of other third party medical professionals,
>
> And that such evidence, which may otherwise contain physician/patient
> information; shall be screened for that evidence that fall[s] within the scope of the
> warrant, from those [sic] that do not.  Only those materials relevant to the illegal
> distribution of controlled substances by Warren Stack M.D. will be compiled and
> provided to the prosecution team.

(Id. at 2.)

### 2.      Issuance of the Computer Search Warrant

A state magistrate issued Computer Search Warrant #320 (the Third Warrant) based on

Detective Bartlett's affidavit after finding probable cause to believe that the computers stored

evidence of illegal distribution of a controlled substance.  The Third Warrant described the

14

property to be searched:

> Intermountain West Regional Computer Forensic Laboratory, Three Gateway
> office Center 440 W. 200 S. Suite 300 Salt Lake City, Utah 84101, in its secure
> evidence room there is now located a mirror image of the following computer
> equipment: A Compaq Presario Tower serial number 1X9BCt989177, a HP
> Pavilion Tower serial number MXF53301WS, a Iomega Zip Disc 250 MB serial
> number 6-062A3D, and a white no name tower with purple buttons with no
> visible serial number.

(Third Warrant at 1 (attached as Ex. 5 to Def.'s Mem. Supp. Mot. Suppress).)  These were the

computers seized during the May 2007 office search.  The evidence to be seized was described as

follows:

1. Patient records; to include . . . but not limited to customer names, phone numbers,
   appointment schedules, addresses, pager numbers, and email addresses, which
   records relate to the illegal distribution of controlled substances such as those
   prescribed to the U/C or C/S, or to patients that have overdosed and/or died, or to
   any other patient that has been prescribed such medications, which include:
   Oxycontin, Oxycodone, Hydrocodone, Alprazolam-Xanex, Methadone-
   Methadose, Soma-Carispradol, and Fentnyl.

2. Billing records, phone numbers, cell phone call lists, and caller id lists which
   relate or correlate with the illegal distribution of controlled substances.

3. Phone records; bills, phone numbers, cell phone call lists, and caller id lists.

4. Opened correspondence, to include electronic letters, notes, e-mails, instructions,
   plans, etc. relating to violation of U.C.A. 58-37-8 *et. seq.*, illegal distribution of
   controlled substances, but *excluding* any un-opened e-mail correspondence.

5. Digital Photographs relating to the business / illegal distribution of controlled
   substances operations;

6. Internet history related to the illegal distribution of controlled substances;

7. All banking records, accounts payable or owing, related to the illegal distribution
   of controlled substances;

8. The terms "records" and "information" include all of the foregoing items of
   evidence in whatever form and by whatever means they may have been created or

stored, to include all programs, data, and files stores [sic] on the hard disk drives in electrical, electronic, or magnetic form, such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, or USB storage devices, connected with or inside the premises, whether they be intact, hidden, or deleted;

9.      Any other fruits and/or instrumentalities of the crime of illegal distribution of controlled substances evidenced within the premises.

(Id. at 1-2 (emphasis in original).)

## E.      Remedy Sought

Dr. Stack now seeks suppression of all evidence obtained through the government's search of Dr. Stack's office, its seizure of bank account and records, and its search of Dr. Stack's office computers.

## II. CONCLUSIONS OF LAW

## A.      The First Warrant and Search of Dr. Stack's Medical Office Were Valid.

Dr. Stack contends that the First Warrant's lack of basic command language shows that it was not a warrant at all and that neither an objective officer nor a neutral magistrate could have read the First Warrant and reasonably concluded that it was valid.  Accordingly, he argues, when the officers relied on the First Warrant, they actually conducted a warrantless search in violation of his Fourth Amendment rights.  Alternatively, he contends that the First Warrant was overbroad because the long list of items to be seized was not described with particularity[9] and so

---

[9]Dr. Stack argues that the government may not rely on the agents' conclusion that Dr. Stack's medical practice was "permeated by fraud" (May 2007 Aff. at 14) to justify the First Warrant's broad list of items to be searched and seized, because neither the facts nor the law permit such a conclusion.  (See Def.'s Mem. Supp. at 13-14 (citing Voss v. Bergsgaard, 774 F.2d 402 (10th Cir. 1985).)  Because the court finds that the First Warrant and the search it authorized survive the motion to suppress regardless of the affiants' conclusion that the practice was

it constituted a general warrant that no reasonable officer could execute in good faith.  See, e.g.,

Massachusetts v. Sheppard, 468 U.S. 981, 988 n.5 (1984) ("[A] search conducted pursuant to a

warrant that fails to conform to the particularity requirement of the Fourth Amendment is

unconstitutional.").  And, finally, he contends that any evidence seized during subsequent

searches that was based on evidence derived from the first search (i.e., "fruit of the poisonous

tree"), must be suppressed.

> **1.      The Search of Dr. Stack's Medical Office Was Not Warrantless.**

To the extent that Dr. Stack contends that the First Warrant (and thus the search) was not

valid because it did not satisfy the requirements of Rule 41(e)(2) of the Federal Rules of Criminal

Procedure, the court disagrees.  According to Rule 41, a warrant to search or seize a person or

property

> must identify the person or property to be searched, identify any person or
> property to be seized, and designate the magistrate judge to whom it must be
> returned.  The warrant must command the officer to: (I) execute the warrant
> within a specified time no longer than 10 days; (ii) execute the warrant during the
> daytime, unless the judge for good cause expressly authorizes execution at another
> time; and (iii) return the warrant to the magistrate judge designated in the warrant.

Fed. R. Crim. P. 41(e)(2)(A) (emphasis added).

It is undisputed that the First Warrant does not state when to execute the warrant, or when

and where to return the warrant, and it does not contain an express command to the searching

officers.  The lack of this information is a violation of Rule 41.  But absent a violation of a

constitutional right, a violation of Rule 41 does not automatically require suppression of evidence

---

"permeated by fraud," and because the agents did not seize all records in Dr. Stack's office, the
court declines to reach that issue.

seized during the search.

> Unless there is a clear constitutional violation, non-compliance with Rule 41 requires suppression of evidence only where (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the rule.

United States v. Rome, 809 F.3d 665, 669 (10th Cir. 1987) (quoting United States v. Stefanson, 648 F.2d 1231, 1235 (9th Cir. 1980), and noting that Tenth Circuit adopted Stefanson standard in United States v. Pennington, 635 F.2d 1387 (10th Cir. 1981)).

As discussed Parts II.A.2 and II.A.3 below, the court finds there was no "clear constitutional violation" of Dr. Stack's Fourth Amendment rights.  And for the reasons set forth immediately below, the court holds that the violations of Rule 41 alone do not justify suppression of the evidence seized from Dr. Stack's office.

Applying the analytical framework set forth in United States v. Rome, the court finds no prejudice to Dr. Stack.  That is, even if the affiants and magistrate had followed Rule 41 to the letter, the record does not support the conclusion that perfect compliance would have resulted in no search (or a "less abrasive" search).  See, e.g., United States v. Cazares-Olivas, 515 F.3d 726, 730 (7th Cir. 2008) (denying suppression motion based on Rule 41 violation and finding that although magistrate did not sign an original warrant, "violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause, and with advance judicial approval.") (quoting Rome);  United States v. Dewar, 489 F. Supp. 2d 351, 364-65 (S.D.N.Y. 2007) (denying motion to suppress based on Rule 41(e)(2)(a) despite warrant's lack of command to execute search within ten days, stating, "it is worth noting that the warrant was in fact executed just one day after it was issued.").  Nor does the record contain any evidence of an

18

intentional and deliberate disregard of Rule 41 by the officers or the magistrate.  Accordingly, the violation of Rule 41 does not justify suppression of the evidence obtained during the office search.

>    **2.      The First Warrant Was Not Overbroad.**

The court holds that the First Warrant satisfied the Fourth Amendment's particularity requirement both for the person and place to be searched and for the items to be seized.

>    a.      <u>The First Warrant Described the Person and Place to Be Searched With Sufficient Particularity.</u>

A reading of the language in the First Warrant makes it abundantly clear that the First Warrant described the person and place to be searched with particularity.  It listed the physical characteristics and age of Dr. Stack, gave the exact address of his office, and listed the physical characteristics and location of his office suite in detail.  The Fourth Amendment requires nothing more.

>    b.      <u>The First Warrant Described the Items To Be Seized With Sufficient Particularity.</u>

In <u>United States v. Leary</u>, 846 F.2d 592 (10th Cir.1988), the Tenth Circuit set out the standard for evaluating whether a description of items to be seized satisfies the Fourth Amendment's particularity requirement:

>    A description is sufficiently particular when it <u>enables the searcher to reasonably ascertain and identify the things authorized to be seized.</u> Even a warrant that describes the items to be seized in <u>broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit.</u> However, the fourth amendment requires that the government describe the items to be seized <u>with as much specificity as the government's knowledge and circumstances allow,</u> and warrants are conclusively invalidated by their <u>substantial failure to specify as nearly as possible the distinguishing characteristics</u> of the goods to be seized.

Id. at 600 (internal quotations and citations omitted) (emphasis added).

Here, Dr. Stack claims that the First Warrant's description of items to be seized from his office was overbroad. He points to paragraphs one through five of the First Warrant, which read as follows:

1.    Business documents; to include but not limited to accounting books and records, receipts, phone records, hand written notations, billing documents, financial receipts, employee rosters, employee work schedules, employment applications and/or bank statements records or contracts, payroll information, tax records, call logs, and employee photographs.

2.    Patient records; to include but not limited to patient names, phone numbers, appointment schedules, address, pager numbers, and email addresses, either written or electronically stored on, Computers and media storage devices, or audio/video recording devices; to include but not limited to desktop computers, lap top computers, communication devices[,] personal data assistants, and all applicable data storage devices, both internal and external.

3.    Patient records; Patient charts; to include the following medications that have been prescribed to the U/C, C/S or patients that have overdosed and/or died.  And any patient that has been prescribed the following medication: Oxycontin, Oxycodone, Hydrocodone, Alprazolam-Xanex, Methadone-Methadose, Soma-Carispradol, and Fentnyl.

4.    Phone records; bills, phone numbers, cell phone call lists, and caller id lists.  And authorization to intercept incoming telephone calls during execution of said warrant.

5.    And all other items determined to be instrumentalities of the crime of distribution of controlled substance[.]

(First Warrant at 1-2 (emphasis added).)  According to Dr. Stack, the language quoted above "permitted the seizure of virtually every record and indicia of information in Stack's office" and converted the warrant into a general warrant.  (Def.'s Mem. Supp. Mot. Suppress at 12.)  The court disagrees.

20

The First Warrant was not a general warrant because it contained the following limitations:  Paragraph Three of the First Warrant; the patient list and drug list provided to the searching agents; and the nature of the crime alleged (distribution of a controlled substance). Moreover, the broad scope of the records to be searched was not problematic because the fourteen-page affidavit established probable cause to search the records listed in those five paragraphs.  See, e.g., United States v. Hargus, 128 F.3d 1358, 1363 (10th Cir. 1997) ("Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit.") (quoting David v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997)); Voss v. Bergsgaard, 774 F.2d 402, 408 (10th Cir. 1985) ("The breadth of a warrant must be justified by the breadth of the probable cause.") (Logan, J., concurring); United States v. Hayes, 794 F.2d 1348, 1355 (9th Cir. 1986) ("The number of files that could be scrutinized . . . is not determinative.  The search and seizure of large quantities of material is justified if the material is within the scope of probable cause underlying the warrant.").  In addition, the amount of documents seized was relatively small compared to the amount of documents in the office.  (See Tr. at 19.)  See also Voss, 774 F.2d at 405 (execution of search good evidence of whether warrant was overbroad).

To support his overbreadth claims, Dr. Stack cites to a series of cases that are factually distinguishable.  First, he cites to United States v. Leary, 846 F.2d 592 (10th Cir. 1988).  In Leary, the court found the warrant overbroad because it allowed agents to search through a list of records that "encompassed virtually every document that one might expect to find in a modern expert company's office" and because it broadly allowed seizure of documents related to "the purchase, sale and illegal exportation of materials in violation of the" federal export laws.  Id. at

601-02.  The court stated that "[i]f the warrant were narrower in either respect, or if it included some other limitation, we might find it valid."  Id. at 601 n.15.  The court also characterized the situation as "one of those 'unusual' cases where suppression of the evidence is appropriate to deter government misconduct."  Id. at 610.   Here, the First Warrant contained more limitations than the warrant in Leary.  For instance, the warrant listed the controlled substances targeted by the investigation, specifically stated that the crime being investigated was distribution of a controlled substance, and narrowed the search to evidence of patients to whom Dr. Stack had prescribed the listed substances and, in particular, evidence of patients overdosing or dying after being prescribed the listed controlled substances by Dr. Stack.

Dr. Stack also cites to Voss v. Bergsgaard, 774 F.2d 402 (10th Cir. 1985), to support his overbreadth claim.  In Voss, the court found three warrants obtained by the IRS to be overbroad because they cited to a very broad federal statute prohibiting conspiracies to violate any federal statute, which "place[d] no real limitation on the warrant."  Id. at 405.  The only other language in the warrants

> authorized the seizure of all books, records or documents relating to the following [National Commodities and Barter Association and its National Commodities Exchange] customer accounts; financial transactions, financial services; the purchase, sale, or storage of precious metals; employees; and marketing promotions.  They further authorized the seizure of books, literature and tapes advocating nonpayment of federal income taxes; publications of tax protestor organizations; and literature relating to communications between persons conspiring to defraud the IRS, or to conceal such fraud.

Id.  Unlike the warrant here, the Voss warrants did not list a specific crime or describe a category of transactions that were evidence of the specific crime.  The Voss court also was concerned that the search implicated free speech and associational rights and that agents took virtually

22

everything in the office being searched.

Despite Dr. Stack's assertion, none of the factors in <u>Voss</u> are present in Dr. Stack's case. He unpersuasively contends that the First Warrant authorized the agents to seize "written materials and other records protected by the First Amendment, such as legally privileged and highly personal medical documents" and that such authorization "confirms the overbreadth of the [First Warrant]." (Def.'s Mem. Supp. at 13.)  According to Dr. Stack, "[b]ecause medical records are reasonably expected to contain information protected by the First Amendment, warrants for the seizure of such records should be drafted with 'scrupulous exactitude.'" (Def.'s Reply Mem. at 10 (citing <u>Stanford v. Texas</u>, 379 U.S. 476 (1965), and <u>Voss v. Bergsgaard</u>, 774 F.2d 402 (10th Cir. 1985).)  But <u>Stanford v. Texas</u>, 379 U.S. 476 (1965), in which the plaintiff challenged a warrant to search the Communist Party's Texas office for documents containing ideas protected by the First Amendment, is distinguishable on its facts.  So is <u>Voss</u> (as noted above).  774 F.2d at 405 (warrant authorized search and seizure of tax protestor literature).  The court questions Dr. Stack's assumption that the records at issue are protected by the First Amendment (speculation, rather than facts or further analysis, supports his claim).  In any event, his argument that medical records are inherently more sensitive than other business documents does not support his claim that the First Warrant was overbroad.  The medical nature of the business is not a reason to immunize medical offices from justified searches by law enforcement officers.  The fact that agents were allowed to search patient records is unremarkable given the allegations in the May 2007 Affidavit.  Rather, the question is whether reasonable limits were placed on those searches.

The court finds the analysis in two factually analogous cases from other jurisdictions

more applicable here.  In those decisions, the courts rejected arguments similar to those raised by

Dr. Stack.

In <u>United States v. Hayes</u>, 794 F.2d 1348 (9th Cir. 1986), the court rejected the defendant

physician's challenge to warrants authorizing searches of his three offices for records evidencing

illegal distribution of controlled substances.  The warrants in <u>Hayes</u> authorized seizure of the

following:

> (1) demerol (mependine), morphine sulfate and other controlled substance; (2) all
> records which document the purchasing, dispensing and prescribing of controlled
> substances, including, but not limited to, records contained in patient charts and
> all relevant records required to be maintained by Title 21 of the Code of Federal
> Regulations, Part 1300 to end and Sections 11190 and 11191 of the California
> Health and Safety Code; (3) patient logs, appointment books and other records
> and ledgers reflecting distribution of controlled substances; (4) correspondence
> concerning the procuring, transferring, administering, prescribing or dispensing of
> controlled substances by Dr. Hayes; all of which constitute evidence of possible
> violations of 21 USC 841(a)(1) and 21 USC 843(a)(3).

<u>Id.</u> at 1355.

The defendant doctor in <u>Hayes</u> contended that the warrants were facially overbroad

because the warrants "permitted the officers to examine thousands of patient files."  <u>Id.</u>  The

court, noting that the three offices contained over 10,000 patient files, did not find the doctor's

overbreadth argument persuasive.  The court said that "[t]he number of files that could be

scrutinized . . . is not determinative.  The search and seizure of large quantities of material is

justified if the material is within the scope of probable cause underlying the warrant."  <u>Id.</u>

The doctor in <u>Hayes</u> also asserted that "the warrant failed to provide standards for the

officers to distinguish between those files the officers could seize and those they could not and

that the warrants should have been more narrowly drawn."  <u>Id.</u> at 1356.  The Ninth Circuit

24

disagreed, stating that "[i]n searches of this nature 'some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'" Id. (quoting Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976)). The appellate court found that the warrants' requirement that items seized must relate to illegal distribution of controlled substances was a reasonable guide and sufficient limiting standard. Id.

Finally, the doctor in Hayes argued that the officers should have limited their search and seizure to 58 patient files, for whom the officers had concrete information concerning potential violations involving Schedule II drugs. The Ninth Circuit rejected that argument as well, noting that the warrants were supported by probable cause to seize all documents concerning illegal distribution of controlled substances. Id.

In United States v. Lievertz, 247 F. Supp. 2d 1052 (S.D. Ind. 2002), a pain management physician (who was charged with multiple counts of possession of a controlled substance (Oxycontin) with intent to illegally distribute, and health care fraud) filed a motion to suppress evidence seized during a search of his medical office. He contended that the warrant lacked probable cause and was overbroad (i.e., that it lacked specificity and amounted to a general warrant).[10]

The affidavit for the Lievertz warrant provided information that the average dose prescribed by Dr. Lievertz was larger than the highest dose given in a clinical trial referenced in the Physicians' Desk Reference and that a pharmacy refused to fill a patient's prescription

---

[10]He also raised an issue concerning patient privacy. The court questioned whether the defendant had standing to raise the issue, but nevertheless held that the government's compelling interest in deterring and stopping illegal activity outweighed the patients' privacy interests in that particular situation. Lievertz, 247 F. Supp. 2d at 1063.

because it prescribed an overdose amount of medication.  A consulting doctor opined that such prescriptions exceeded medical necessity.  The affidavit further noted that, according to a reliable source, the defendant was a known Oxycontin dealer.  All of this information, the Lievertz court said, provided probable cause for issuing the warrant.

The Lievertz court also rejected the defendant's contention that the warrant lacked the necessary particularity and that the list of items to be seized was so broad that it amounted to a general warrant.  The court found that the warrant's thirteen-paragraph list describing items to be seized—such as categories of evidence and contraband relating to drug dealing and Medicaid fraud—provided a sufficient limitation.  In fact, the court found it preferable to direct the agents to seize all medical records rather than require them to "exercise discretion to determine which prescriptions provided dosages in excess of medical necessity." Id. at 1062.  As for the defendant's overbreadth argument (i.e., that the warrant was overbroad because it authorized seizure of "all medical records, billing records, Medicaid records, and patient files"), the unpersuaded court stated, "It would be impossible for the government to determine how many of Lievertz's patients were involved in this alleged scheme to overprescribe and distribute controlled substances if the government were unable to search all of Lievertz's medical records, billing records, Medicaid records, and patient files." Id. at 1063.

Beyond the above-cited case law, the record of how the search was conducted here is evidence that the First Warrant was not overbroad.  While generally such evidence may be helpful when determining whether a warrant was overbroad, Voss, 774 F.2d at 405, the court finds that the record in this case does not support Dr. Stack's assertion that the agents' search exceeded the scope of the warrant and so is evidence of a general warrant.

26

Agent Johnson's description of how the office search was conducted actually supports the government's position that the First Warrant was not overbroad.  There was no evidence of overreaching.  The testimony demonstrates that the searching agents used the language in Paragraph 3 of the First Warrant (similar to the information contained in the list of drugs and patients to which the agents referred during the search) to limit their search.  The fact that they seized some documents that were ultimately determined not to satisfy the requirements of the warrant is not evidence of an overbroad warrant or that agents exceeded the scope of the warrant.[11]  United States v. Hargus, 128 F.3d 1358, 1363 (10th Cir. 1997) ("[A] search is not invalidated merely because some things are seized that are not stated in the warrant.").

Moreover, the restraint exercised by the searching officers supports application of the Leon good faith exception to the warrant requirement.

**2.      The Leon Good Faith Exception Applies To The Search of Dr. Stack's Office.**

The court alternatively holds that the First Warrant and search of Dr. Stack's office fall

_____

[11]The record does not justify the remedy Dr. Stack seeks.  The Tenth Circuit has recognized that blanket suppression is an extreme remedy and not properly applied unless agents who executed the warrant "so grossly exceeded the scope of the warrant as to manifest a flagrant disregard for the warrant's terms, thus converting the warrant into an unlawful general warrant." United States v. Le, 173 F.3d 1258, 1272 (10th Cir. 1999).

The general rule, where executing officers exceed the scope of a warrant, is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant.  In the vast majority of cases, a search is not invalidated merely because some things are seized that are not stated in the warrant.  This is particularly true when the non-specified items are not admitted into evidence against the defendant.  In very rare cases, however, we have applied the unusual remedy of blanket suppression.

Id. at 1269 (internal quotations and citations omitted).  The facts in this case does not rise to the level of "flagrant disregard for the warrant's terms."

within the good faith exception to the warrant requirement.  That exception, articulated in United States v. Leon, 468 U.S. 897 (1984), requires that evidence not be suppressed when the officer conducting the search "act[s] in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause."  Leon, 468 U.S. at 900, 920-21.  See also Massachusetts v. Shepard, 468 U.S. 981, 988 (1984) (applying Leon exception to warrants that violate Fourth Amendment's particularity requirement).  According to the Supreme Court, "[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  Leon, 468 U.S. at 919 (emphasis added).

In assessing the good faith exception, a court's inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  United States v. Bishop, 890 F.2d 212, 216 (10th Cir. 1989) (quoting Leon, 468 U.S. at 923 n.23).  The court considers "all of the circumstances" when making this determination.  Leon, 468 U.S. at 923 n.23.  The government "bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable."  United States v. Cook, 854 F.2d 371, 373 (10th Cir. 1988) (quoting United States v. Michaelian, 803 F.2d 1042, 1048 (9th Cir. 1986)).  But "[t]he first notion to be remembered in considering the good faith principle is the presumption created in Leon that when an officer relies upon a warrant, the officer is acting in good faith."  United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985).

The Supreme Court has identified four situations in which the good faith exception to the

exclusionary rule does not apply.  See id. at 922-23.  As articulated by the Tenth Circuit, they are:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known to be false if not for his reckless disregard of the truth.  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000) (quoting Leon) (emphasis added; internal citations omitted).  Dr. Stack contends that here the second and fourth situations exist here and preclude a finding of good faith.

First, he asserts that the First Warrant was so facially deficient that the magistrate must not have read the warrant (although there is no direct evidence of that) and so his signature was nothing more than a rubber stamp, evidencing the magistrate's abandonment of his judicial role.  But the very existence of the lengthy and detailed affidavit, as well as the warrant's description of the items to be seized (curtailed by the list of controlled substances and the category of patients at issue) belie Dr. Stack's allegation that the signing magistrate wholly abandoned his judicial role.  Evidence of an abandonment would be more akin to finding of probable cause based on a "bare bones" affidavit.  See id.  That is not the situation here, where the magistrate had a "substantial basis for concluding that probable cause existed."  Illinois v. Gates, 462 U.S. 213, 238-39 (1983).

Second, Dr. Stack asserts that the First Warrant was so facially deficient and the affidavit so lacking in probable cause that no reasonable officer could reasonably believe the warrant was valid.  For the same reasons cited above, the fourth exception under Leon (when "a warrant is so facially deficient that the executing officer could not reasonably believe it was valid") is equally

29

inapplicable.  The agents did everything that could reasonably be expected of them.  See

Shepard, 468 U.S. at 989.  They drafted a detailed affidavit.  They presented the affidavit to an

Assistant Attorney General for the State of Utah for review and approval.  They submitted it with

a warrant to a magistrate (there is no direct evidence that the magistrate was anything but

detached and neutral).  The magistrate concluded that the affidavit established probable cause to

search the office for the crime alleged.  Applying the exclusionary rule here would not serve the

deterrent purpose the rule was designed to achieve.  See id. at 990.

Furthermore, given the elements that the affidavit and warrant did contain, the violations

of Rule 41 in the signed warrant do not render the warrant "so facially deficient" that reliance on

it would be unreasonable.  The warrant was titled "Search Warrant" and signed by a magistrate

who determined that "[p]roof by Affidavit under oath having been made this day before me by

Daniel J Bartlett, I [the magistrate] am satisfied that there is probable cause to believe" that

evidence of distribution of a controlled substance would be located at Dr. Stack's office.  (First

Warrant at 1.)  The technical errors do not overshadow the fact that the fundamental

constitutional requirements of a search warrant were present.

Moreover, Agent Johnson's description of the execution of the search shows that the

searching agents treated the First Warrant as a valid search warrant.  Even though the First

Warrant did not contain the commands set forth in Rule 41, the officers executed the First

Warrant as if it did (i.e., they executed the First Warrant during daytime hours, within ten days of

its issuance, left a receipt at Dr. Stack's office listing property seized, and returned the warrant to

the signing magistrate).  (See, e.g., Tr. at 9-18, 23-24, 29; Pl.'s Exs. 1, 2, 5.)

For all these reasons, the court holds that the good faith exception precludes suppression

of evidence seized from Dr. Stack's office.

**B.**     **Evidence Obtained Through the Second Warrant Authorizing Seizure of Bank Accounts and Records Will Not Be Suppressed.**

The Second Warrant authorized seizure of Dr. Stack's bank accounts and related records at two financial institutions: Chase Bank and Washington Mutual Bank.  Dr. Stack challenges the validity of the Second Warrant and the seizure of the bank records, seeking suppression of all such evidence.

**1.     Chase Bank Accounts and Records**

Dr. Stack's first ground for suppression of the Chase Bank records is the "fruit of the poisonous tree" doctrine set forth in Wong Sun v. United States, 371 U.S. 471 (1963).  He contends that because the identity of the bank and Dr. Stack's bank account numbers in the Second Warrant were derived from evidence seized through illegal execution of the First Warrant, the bank records must be suppressed.  Because the court has already held that the First Warrant and the search of Dr. Stack's office were valid, his "fruit of the poisonous tree" argument necessarily fails.

Dr. Stack's second ground for suppression of the Chase Bank records is that the affidavit did not establish probable cause or a nexus between the crimes alleged (illegal distribution of controlled substances and money laundering) and Dr. Stack's accounts and records held by Chase Bank.  He contends that the affidavit did not "specify any accounts used for deposits or allege that the accounts were in Chase Bank" and did not "indicate when [deposits in two specific Chase accounts exceeding $800,000] were made or by whom."  (Def.'s Mem. Supp. at 4.)  He also faults the affidavit for its lack of allegations that anyone in Dr. Stack's office deposited

proceeds of crimes into the specific Chase accounts (although the affidavit does contain

information that Dr. Stack's employees took proceeds from cash payments for allegedly illegal

prescriptions and deposited them into unidentified bank accounts for Dr. Stack) or that the money

in those accounts had been used in any unlawful dealings.  Finally, he contends that the affidavit

"did not provide any underlying facts from which the magistrate might have" independently

concluded that "Dr. Stack was depositing proceeds from illegal drug transactions into his

personal or business accounts in an effort to hide or fund further illegal business practices." (Id.

at 4-5; Aff. for Second Warrant at 23.)

        In assessing probable cause, the court must evaluate the affidavit under the "totality of

circumstances" test adopted by the United States Supreme Court in Illinois v. Gates, 462 U.S.

213 (1983).  The court must determine if the magistrate made "a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place." Id. at 238.

The court must also determine whether the magistrate had a substantial basis for concluding that

probable cause existed.  Id. at 238-39.  The magistrate's decision to issue a warrant is entitled to

great deference.  Id. at 236;  United States v. Glover, 104 F.3d 1570, 1577 (10th Cir. 1997).  See

also United States v. Ventresca, 380 U.S. 102, 109 (1965) ("Although in a particular case it may

not be easy to determine when an affidavit demonstrates the existence of probable cause, the

resolution of doubtful or marginal cases in this area should be largely determined by the

preference to be accorded to warrants.");  United States v. McKneely, 6 F.3d 1447, 1456 (10th

Cir. 1993) (citing Ventresca, the court recognized strong presumption favoring admission of

evidence seized by warrant).

Probable cause also "requires a nexus between suspected criminal activity and the place to be searched." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000) (internal quotation marks and citation omitted).  "A nexus between the objects to be seized and the place to be searched for them is established when the circumstances set out in the affidavit would warrant a person of reasonable caution to believe that the articles sought would be found at the place to be searched."  United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997).

In general, the overall scheme described in the affidavit strongly suggested that Dr. Stack was running a "pill mill" for profit.  (See, e.g., May 2007 Aff. ¶¶ 47-48 (describing the "Express Scripts" program and income from office fees generated by that program.)  The affidavit also stated that Dr. Stack was paying "recruiters" to bring in more patients, a separate aspect of the crime alleged.  That could reasonably fall within the definition of funding illegal business practices.  The affidavit also established that the money from those office fees was being deposited into at least one account held by Dr. Stack.  The May 2007 search revealed the existed of Chase Bank accounts held by Dr. Stack, into which a large amount of deposits ($800,000) had been made.  The medical practice was his alone, so any distinction between personal and business accounts seems immaterial here.

Given the totality of the circumstances, and the deference owed to the magistrate's finding of probable cause, the court finds that the magistrate had a substantial basis for concluding that probable cause existed for the seizure of the Chase Bank accounts and records.

Similarly, given the facts set forth above, the court finds that the affidavit established a nexus between the alleged crimes and the Chase Bank accounts.  That is, the magistrate could reasonably infer that the proceeds from the illegal activities were deposited into the Chase Bank

accounts owned by Dr. Stack and that Dr. Stack used some of those proceeds to pay "recruiters." Dr. Stack's assertion that the affidavit failed to establish a nexus because it did not specify exactly which bank account the office fees were being deposited into is not persuasive.  Overall, the circumstances set out in the affidavit would warrant a person of reasonable caution to believe that the evidence sought would be found in the Chase Bank accounts.  Accordingly, the court holds that the affidavit for the Third Warrant established the requisite nexus.

>    **2.      Washington Mutual Bank Accounts and Records**

Dr. Stack also contends that the warrant for seizure of the Washington Mutual Bank accounts and records was not supported by probable cause.  Although the court agrees with Dr. Stack's contention, the Return on the Second Warrant showed that no such accounts or records existed.  (See Return to Search Warrant #235 and attachments, including May 22, 2007 Ltr. from Washington Mutual Bank to Special Asst. U.S. Atty Lana Taylor (stating that bank was "unable to locate any records of accounts" for Warren R. Stack) (Pl.'s Ex. 4).)  Accordingly, there is nothing to suppress.  See also, e.g., United States v. Lievertz, 247 F. Supp. 2d 1052, 1063 (S.D. Ind. 2002) (stating that defendant's objection to warrant authorizing seizure of computers in medical office was "likely moot" because the computers were not actually seized).

For the foregoing reasons, Dr. Stack's motion to suppress evidence obtained through the Second Warrant is DENIED.

## C.      The Third Warrant and Search of Dr. Stack's Office Computers is Valid.

Dr. Stack contends that the Third Warrant (authorizing search of office computers) was overbroad and was not supported by probable cause because the affidavit did not contain facts establishing a nexus between the crime of distribution of controlled substances and the medical

34

office computers.  See United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000)

(probable cause "requires a nexus between suspected criminal activity and the place to be

searched") (internal quotation marks and citation omitted).[12]  In response to Dr. Stack's nexus

argument, the government essentially relies on the argument that common sense, under the

circumstances, reasonably leads to the conclusion that the office computers would contain

evidence of the alleged crimes.

### 1.      The Third Warrant is Not Overbroad.

According to Dr. Stack, the Third Warrant is overbroad because it

> did not detail how the police officers should or could distinguish evidence of
> illegal distribution of drugs from legitimate medical care, or how they should or
> could distinguish between records documenting the activities of Stack from the
> activities of the other third party medical professionals working in his office.  Nor
> did the warrant detail how the police officers could or should distinguish between
> data falling within or outside the ostensibly limitless scope of the warrant.

(Def.'s Mem. Supp. at 6.)  This is the same argument Dr. Stack raised in his challenge to the First

Warrant.

The Tenth Circuit has "adopted a somewhat forgiving stance when faced with a

'particularity' challenge to a warrant authorizing the seizure of computers."  United States v.

Grimmett, 439 F.3d 1263, 1269 (10th Cir. 2006).  Still, "warrants for computer searches must

affirmatively limit the search to evidence of specific federal crimes or specific types of material."

United States v. Riccardi, 405 F.3d 852, 862 (10th Cir. 2005).  They do not, however, need to set

--------------------------------------------------------

[12]Dr. Stack also contends that evidence obtained from the computer search was fruit of
the poisonous tree, see Wong Sun v. United States, 371 U.S. 471 (1963), because it was derived
from the First Warrant.  Because the court finds the First Warrant and first search valid, Dr.
Stack's "fruit of the poisonous tree" argument necessarily fails.

forth a specific search methodology.  United States v. Brooks, 427 F.3d 1246, 1251 (10th Cir. 2005).

Here, the Third Warrant's list of items to be seized during the computer search was stated with sufficient particularity and with sufficient restrictions.  It contained a subject matter restriction (i.e., evidence of the crime of illegal distribution of controlled substances to known as well as then-unknown patients).  (See Third Warrant at p. 1, ¶ 1.)  See also Brooks, 427 F.3d at 1253 (rejecting overbreadth argument because computer search warrant contained "subject matter restriction ['evidence of child pornography'] on the authorization to search" an otherwise broad list of documents the warrant described as "correspondence, including printed or handwritten letters, electronic text files, emails and instant messages").  The warrant cited to a specific Utah statutory provision.  (Third Warrant at p. 1, ¶ 4.)  It expressly limited correspondence to "opened" correspondence.  (Id.)  For substantially the same reasons the court found that the First Warrant was not overbroad, and for the reasons cited above, the court denies Dr. Stack's motion to suppress evidence from the computer search based on his particularity argument.

### 2.    The Third Warrant Establishes a Sufficient Nexus.

"A nexus between the objects to be seized and the place to be searched for them is established when the circumstances set out in the affidavit would warrant a person of reasonable caution to believe that the articles sought would be found at the place to be searched."  United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997).

In Hargus, the Tenth Circuit rejected the defendant's nexus argument.  It said,

There need not be direct evidence or personal knowledge that the items sought are

36

located at the place to be searched . . . .  Here the investigator's affidavit indicated that [the defendant] was reached at his home when the stolen oil buy was arranged.  This fact, together with <u>the nature of the small business [the defendant] operated and the ongoing conspiracy described in the affidavit</u>, made it reasonable for the issuing judge to conclude that the records described in the affidavit would be found at [the defendant's] house.

<u>Id.</u> (emphasis added).

In addition to <u>Hargus</u>, the Second Circuit opinion in <u>United States v. Singh</u>, 390 F.3d 168 (2d Cir. 2004), is instructive.  In <u>Singh</u>, the court addressed a nexus challenge raised by a physician facing criminal charges similar to those brought against Dr. Stack.  The appellate court noted that a "showing of nexus does not require direct evidence and may be based on <u>reasonable inference from the facts presented based on common sense and experience</u>."  <u>Id.</u> at 182 (internal quotation marks and citation omitted; emphasis added).  Applying that standard, the Second Circuit held that billing and accounts payable records that were evidence of illegal distribution of controlled substances and health care fraud (and which were seized from a computer) "were of the type that would necessarily . . . and . . . reasonably be found in the business office of any medical practice."  <u>See also, e.g.</u>, <u>United States v. Feliz</u>, 182 F.3d 82, 88 (1st Cir. 1999) ("The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather can be <u>inferred from the type of crime, the nature of the items sought</u>, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime] . . . .") (internal quotation marks and citation omitted; alteration in original).

Here, the affidavit established the existence of computers at the medical office where much of the alleged crime occurred.  The affidavit showed that the computers were used by the

office staff to schedule appointments, so it is fair to conclude that patient records were located on

the computer.  (Given the frequency of patient visits, the schedule of appointments would be

relevant to the crime alleged and there is certainly sufficient evidence that documentation of

appointments was located on at least one of the computers searched.)  Moreover, given the nature

of the business (a sole practitioner's medical practice), it is reasonable to conclude, based on

common sense as well as the facts alleged in the supporting affidavit, that the office computers

would contain patient records and other documentation of how the practice (alleged to be a "pill

mill") was operated.  This would be evidence of the crime of illegal distribution of controlled

substances, as was described in the affidavit.

For the reasons set forth above, and based on the standards articulated in Hargus,

Grimmett, and Singh, the court finds that the government established a sufficient nexus to justify

issuance of the Third Warrant.

### 3.        The Leon Good Faith Exception Applies to the Computer Search.

Even if the Third Warrant lacked the requisite particularity or nexus, agents seized the

evidence in objectively reasonable reliance on the warrant.  The officers drafted the affidavit,

signed it under oath, had it reviewed and approved by an Assistant Attorney General for the State

of Utah, presented it to a detached and neutral magistrate along with the warrant, and obtained a

signature from the magistrate who found probable cause to conduct the search.  The Third

Warrant was limited to evidence of crimes identified in the affidavit.  And nothing in the record

shows that the officers expanded the scope of the search beyond that authorized by the Third

Warrant.  "Where an officer acting with objective good faith obtains a search warrant from a

detached and neutral magistrate and the executing officers act within its scope, there is nothing to

38

deter." <u>United States v. Riccardi</u>, 405 F.3d 852, 863 (10th Cir. 2005) (internal citations and quotation marks omitted).

Accordingly, the court finds that the good faith exception to the warrant requirement precludes suppression of evidence seized from the computers.

## ORDER

For the foregoing reasons, Defendant Warren R. Stack's Motion to Suppress (Dkt # 59) is DENIED.

DATED this 22nd day of January, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge

39